James LEE, Anthony Miller, and
Terry Williams, Plaintiffs,

v.

ITT STANDARD and United
Steelworkers Local 897,
Defendants.

No. 98–CV–183A.

United States District Court,
W.D. New York.

April 2, 2002.

Sanders & Sanders, Harvey P. Sanders, of Counsel, Amherst, for Plaintiffs.

Hodgson Russ Andrews Woods & Goodyear, LLP, Robert B. Conklin, and Adam W. Perry, of Counsel, Buffalo, for Defendant ITT Standard.

Law Offices of E. Joseph Giroux, Jr., Buffalo, for Defendant United Steelworkers Local 897.

## DECISION AND ORDER

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on May 14, 1998. On November 15, 1999, defendants ITT Standard and United Steelworkers Local 897 filed motions for summary judgment. On January 24, 2000, plaintiffs filed a response in opposition to the motion for summary judgment. Counsel for plaintiffs supplemental affidavits in opposition to the motions for summary judgment on March 22, 2000 and July 28, 2000. Defendant ITT Standard moved to strike plaintiffs' supplemental affidavits as untimely.

On March 20, 2001, Magistrate Judge Foschio filed a combined Report and Recommendation and a Decision and Order: (1) ordering that defendant ITT standard's motion to strike be granted in part and denied in part; (2) recommending that defendant ITT Standard's motion for summary judgment be granted as to plaintiffs Miller and Williams, but denied as to plaintiff Lee; and (3) recommending that defendant United Steelworkers' motion for summary judgment be granted as to plaintiffs Miller and Williams, but denied as to plaintiff Lee.[1] Both parties filed objections and the Court heard oral argument on July 27, 2001.

■ Plaintiffs object to the Magistrate Judge's Decision and Order granting in part defendant ITT Standard's motion to strike their July 28, 2000 submission. Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court "may reconsider any pretrial matter under this subparagraph (A), where it has been shown that the magistrate's order is clearly erroneous or contrary to law." The Court finds that the Magistrate Judge's Decision and Order was neither clearly erroneous or contrary to law. Accordingly, plaintiffs' objections to the Decision and Order are denied.

Both plaintiffs and defendants object to the Magistrate Judge's Report and Recommendation, which recommends that summary judgment be denied in part and granted in part. Specifically, defendants object to those portions of the Report and Recommendation that recommend denying their motion for summary judgment as to plaintiff Lee, and plaintiffs Miller and Williams object to those portions of the Report and Recommendation that recommend granting defendants' motions for summary judgment as to them.

---

1. The Magistrate Judge also recommended that this Court issue an order to show cause as to why plaintiff's counsel should not be disciplined based upon a scurrilous remark made about defendant ITT Standard's Human Resources Manager. The Court declines to issue a show cause order. Plaintiff's counsel was admonished by this Court at oral argument and the Court is confident that counsel will refrain from such derogatory language in the future.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report to which objections have been made. Upon a *de novo* review, and after reviewing the submissions and hearing argument from the parties, the Court hereby adopts Magistrate Judge Foschio's recommendation that summary judgment be granted to the defendants as to the claims raised by plaintiffs Miller and Williams.

As to the claims raised by plaintiff Lee, the Court notes that on February 8, 2002, counsel for defendant ITT Standard filed a suggestion upon the record of the death of plaintiff Lee. Pursuant to Fed.R.Civ.P. 25(a)(1), the successors or representatives of plaintiff Lee shall have until May 9, 2002 to file a motion for substitution. The Court will reserve decision on defendants' summary judgment motions as to plaintiff Lee pending a motion for substitution.

Accordingly, for the reasons set forth herein and in Magistrate Judge Foschio's Report and Recommendation, defendants' motions for summary judgment are granted as to plaintiff Miller and plaintiff Williams. The Court reserves decision on the motions for summary judgment as to defendant Lee pending a motion for substitution. Plaintiffs' objections to the Magistrate Judge's Decision and Order granting in part defendant ITT Standard's motion to strike are denied.

IT IS SO ORDERED

PLEASE take notice of the entry of an ORDER filed on 4/2/02, of which the within is a copy, and entered 4/3/02 upon the official docket in this case. (Document No. 56.)

---

1. Defendants' motions for summary judgment are before the undersigned for a Report and Recommendation on their disposition to Judge Arcara, while Defendant ITT Standard's motion to strike as untimely Plaintiffs' further submissions, Docket Items Nos. 31

REPORT and RECOMMENDATION

DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This case was referred to the undersigned on May 14, 1998, by Honorable Richard J. Arcara for report and recommendation on dispositive motions. The matter is presently before the court on motions for summary judgment filed on November 15, 1999 by Defendant ITT Standard (Docket Item No. 16), and by Defendant United Steelworkers Local 897 (Docket Item No. 18), and to strike filed on March 23, 2000 by Defendant ITT Standard (Docket Item No. 32).[1]

### *BACKGROUND*

Plaintiffs James Lee, Anthony Miller and Terry Williams, employees of Defendant ITT Standard ("ITT"), and members of the United Steelworkers Local 897 ("the Union"), until their terminations in 1996, commenced this action on March 17, 1998, alleging they were wrongfully discharged on the basis of race (African American). Plaintiffs Miller and Williams also allege wrongful discharge based on disability. Plaintiffs assert four causes of action including violations of 42 U.S.C. § 1981 (" § 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, ("the ADA"), and the New York Human Rights Law, N.Y. Exec. Law § 296 ("N.Y. Exec. Law § 296"). Answers filed on May 8,

---

and 34, in opposition to summary judgment is before the undersigned for a Decision and Order. However, because the subject matter of these motions is inter-related, the court will address the motions together in one decision.

1998 by the Union and on May 15, 1998 by ITT assert that Plaintiffs fail to state a claim as to either defendant and request dismissal, costs, and attorney fees.

On November 25, 1998, the parties stipulated to a Protective Order to maintain the confidentiality of certain discovery (Docket Item No. 12) ("Confidentiality Order"). Following discovery, ITT and the Union each moved for summary judgment on November 15, 1999. ITT's motion was accompanied by the Declarations of Adam W. Perry, Esq. ("Perry Declaration"), and Will Shine ("Shine Declaration"), exhibits, a Statement of Uncontested Facts ("Defendant ITT's Fact Statement"), and a Memorandum of Law (Docket Item No. 17) ("Defendant ITT's Memorandum"). The Union's motion was accompanied by a Statement of Undisputed Material Facts (Docket Item No. 19) ("Defendant Union's Fact Statement"), a Memorandum of Law (Docket Item No. 20) ("Defendant Union's Memorandum"), and the Affidavit of Guy Masocco (Docket Item No. 21) ("Masocco Affidavit") with attached exhibits.

On January 24, 2000, Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Docket Item No. 24) ("Plaintiffs' Memorandum"), a volume of documents (Docket Item No. 25) containing Plaintiffs' Rule 56 Statement of Disputed Facts ("Plaintiffs' Rule 56 Fact Statement"), Affidavits by Plaintiffs James Lee ("Lee Affidavit"), Anthony Miller ("Miller Affidavit"), and Terry Williams ("Williams's Affidavit"), and by Plaintiffs' attorney Harvey P. Sanders, Esq. ("Sanders Affidavit I"), and exhibits. On February 17, 2000, certain documents pertaining to Plaintiffs' opposition to summary judgment, originally filed in the public record, were removed from the public record and, pursuant to the Confidentiality Order, filed under seal (Docket Item No. 26).

On February 22, 2000, both ITT and the Union filed papers in further support of their respective summary judgment motions. In particular, ITT filed a Reply Memorandum of Law (Docket Item No. 27) ("Defendant ITT's Reply Memorandum"), and a volume of documents (Docket Item No. 28), containing Reply Declarations of Adam W. Perry, Esq. ("Perry Reply Declaration") and Will Shine ("Shine Reply Declaration"), and exhibits. The Union filed a Reply Memorandum of Law (Docket Item No. 29) ("Defendant Union's Reply Memorandum"), and the Reply Affidavit of Guy Masocco (Docket Item No. 30) ("Masocco Reply Affidavit").

On March 22, 2000, Plaintiffs filed the Affidavit of Harvey P. Sanders, Esq. (Docket Item No. 31) ("Sanders Affidavit II"), with attached exhibits. In the affidavit, Sanders explains that the attached exhibits were originally omitted from the other exhibits Plaintiffs had submitted in opposition to Defendants' summary judgment motions. On March 23, 2000, Defendant ITT moved to strike such exhibits or, alternatively, for an Order permitting ITT to submit additional papers addressing Plaintiffs' recent submissions (Docket Item No. 32). The motion to strike was accompanied by the attached Declaration of Adam W. Perry, Esq., in Support of Motion to Strike ("Perry Declaration in Support of Motion to Strike"). In response to the motion to strike, Plaintiffs filed, on March 31, 2000, the Affidavit of Harvey P. Sanders, Esq. (Docket Item No. 33) ("Sanders Affidavit Opposing Motion to Strike").

On July 28, 2000, Plaintiffs filed the Supplemental Affidavit of Harvey P. Sanders, Esq. (Docket Item No. 34) ("Sanders Supplemental Affidavit"), directing the court's attention to newly discovered facts Plaintiffs maintain are relevant to their case. Defendant ITT filed, on August 8,

2000, the Declaration of Adam W. Perry, Esq., in Response to the Plaintiffs' Second Untimely Submission (Docket Item No. 35) ("Perry Declaration Opposing Plaintiffs' Second Untimely Submission"). Oral argument was deemed unnecessary.

Based on the following, Defendant ITT's motion for summary judgment (Docket Item No. 16) is GRANTED in part and DENIED in part; Defendant Union's motion for summary judgment (Docket Item No. 18) is GRANTED in part and DENIED in part. Defendant ITT's motion to strike (Docket Item No. 32) is GRANTED in part and DENIED in part.

### FACTS [2]

Plaintiffs James Lee, Anthony Miller and Terry Williams, who are African American, allege ITT wrongfully terminated their employment on the basis of their race. Plaintiffs Miller and Williams also allege they were terminated on the basis of their disabilities. Following their terminations, Plaintiffs filed grievances with the Union challenging their terminations. However, the Union determined not to pursue any of Plaintiffs' grievances to arbitration; consequently, Plaintiffs allege that by such failure, the Union breached its duty of fair representation to each of them.

Plaintiffs assert that since at least 1987, ITT and the Union have routinely discriminated against African American employees by excluding such employees from certain departments and jobs, including welding and inspection jobs, and with regard to hiring and pay. Plaintiffs maintain that ITT has manipulated Article VII of the most recent collective bargaining Agreement between ITT and the Union ("CBA"), entitled Reduction in Force/Recall, to discriminate against African American employees by "bumping" them out of choice job assignments.[3] Plaintiffs also assert that African American employees have been disciplined for offenses, including disciplinary and attendance problems, for which white employees are not.

Plaintiffs allege that the Union has not represented African American employees as vigorously as it represents white employees. According to Plaintiffs, since 1987, only one African American has served as Union steward and none have served as Union officers. Gary Majchrzak, the Union's grievance chairman at the time of the Plaintiffs' terminations, allegedly did not treat African American employees the same as white employees, as evidenced by the fact that Majchrzak would, when walking around the plant, visit with white employees, but not African American employees.

Plaintiffs allege that ITT and the Union have pressured African American employees to sign "last chance agreements" to settle grievances. The terms of the last chance agreements provide that any subsequent disciplinary problems would lead directly to discharge. According to Plaintiffs, non-minority employees have not been forced to sign such last chance agreements and, where they have, the agreements are not enforced.

Plaintiffs also alleged that since 1994, ITT has failed to provide necessary accommodations to employees with disabilities, especially in cases where the disabled employee is African American. Additional facts pertaining to each of the three Plaintiffs' respective cases are set forth below.

### James Lee

Plaintiff James Lee ("Lee"), commenced employment with ITT's predecessor in

---

**2.** The fact statement is taken from the pleadings and motion papers filed in this action.

**3.** A copy of the CBA is attached as Exhibit A to Masocco Affidavit.

April 1977. Lee's work record contains a number of disciplinary violations. In particular, in May, 1980, Lee was given a three-day suspension for abusive language. A one-day suspension was assessed in July 1982 for insubordination. Lee was indefinitely suspended in October 1989 for threatening a supervisor, but was allowed to return to work with a warning that any future threats would result in his discharge. In April 1990, Lee was suspended for three days for poor attendance, Lee was given a last and final warning in June 1990 for threatening a supervisor. In October 1990, Lee was discharged for poor attendance. Upon the Union's arbitration of a grievance related to the discharge, Lee was reinstated. Lee was suspended for three days in March 1994 for poor work performance.

In January 1995, Lee was suspended and discharged for insubordination. According to an incident report prepared by ITT Human Resources Manager Will Shine ("Lee's Incident Report"), on January 5, 1995, Shine observed Lee with a plate of food at his work station in ITT's machine shop.[4] Shine maintains that upon directing Lee to bring the food to the cafeteria, Lee became insubordinate claiming that other employees ate at their work stations and threatened to shoot Shine. Shine directed Lee to report to the Personnel Office. Shine walked through the machine shop but did not observe any other employee with food at his work station. According to Shine, he questioned the foreman, John Maher, who stated that other employees occasionally were caught with food at their work stations and were "encouraged to restrict their eating to lunch and break periods." Lee's Incident Report.

As Shine proceeded to the Personnel Office to meet with Lee, he observed that Lee remained in the machine shop. However, Shine later met with Lee in the Personnel Office where Lee denied threatening Shine and claimed he put his food away as instructed. Shine indefinitely suspended Lee for insubordination based on violations of Shop Rule 3b (failing to follow a directive) and the Work Place Violence Policy.

The Union pursued Lee's grievance filed in connection with the discharge to arbitration and, on July 26, 1995, a settlement was reached whereby ITT reinstated Lee in exchange for Lee's execution of a Last Chance Agreement ("Lee's Last Chance Agreement").[5] Lee's Last Chance Agreement provides that Lee admitted he violated ITT Shop Rules by failing to take Shine's directive and the Work Place Violence Policy by threatening to shoot Shine. Lee's Last Chance Agreement further provides that upon any violation of any ITT Shop Rule or the Work Place Violence Policy within two years of his reinstatement, Lee would be discharged.

When Lee reported to work at 6:45 A.M. on March 19, 1996, he was unable to locate his time card and walked out. According to Lee, he left ITT because he was returning from sick leave and did not know to which department he was to report. Lee maintains that he was advised to speak with Mr. Shine, but that Mr. Shine was not expected until 8:30 A.M. Lee maintains that rather than wait for 1¾ hours, he would run an errand, specifically, he decided to go to a pharmacy and have a prescription filled for his wife. According to Lee, he returned at 9:00 A.M. and was told he had been suspended.

---

**4.** A copy of Lee's Incident Report is attached as Exhibit N to ITT's Notice of Motion (Docket Item No. 16).

**5.** A copy of Lee's Last Chance Agreement is attached as Exhibit D to Masocco Affidavit.

In contrast, Defendants maintain that Lee informed ITT security and supervisory personnel that if ITT wanted him, they could call him at home. According to Defendants, upon returning home, Lee telephoned the Union's office and was told to come in. Lee responded that if ITT wanted him, he could be reached at home.

Following his discharge, Lee filed a grievance with the Union. However, the Union did not pursue the grievance to arbitration given Lee's disciplinary record and the fact that he was working pursuant to a last chance agreement, and the Union advised Lee of its decision not to pursue Lee's case on April 12, 1996.

### Anthony Miller

Plaintiff Anthony Miller ("Miller"), began working for ITT in September 1987; his most recent position with ITT was as a shipping clerk. Miller's disciplinary record at ITT included a three-day suspension in 1990 for poor work attendance, a three-day suspension in 1993 for an extended absence taken without permission and violating the 48–hour reporting rule. The 1993 incident resulted in a final warning that future misconduct would result in discharge.

On March 18, 1996 Miller sustained a shoulder injury. Miller claims that the injury occurred at work between 2:00 P.M. and 3:00 P.M., when he, assisted by an unidentified truck driver, lifted a unit weighing between 200 and 300 pounds. Miller did not remember the name of the truck driver, but thought the driver was from the Preston trucking company ("Preston"). Despite pain in his shoulder, Miller completed his shift, however, he called in the next day, requesting a personal day to rest. Miller's shoulder pain increased and he sought treatment on March 19, 1996 at Millard Fillmore Hospital in Buffalo. Miller called in to work on March 19, 1996, and reported he would not be in based on a work-related injury. Miller then notified Shine and returned to work the following week.

Because Miller claimed his shoulder injury was work-related, ITT commenced an investigation for workers' compensation purposes. However, ITT's Vehicle Log for March 18, 1996 did not indicate any truck from Preston was on the premises during the time frame in which Miller claimed he sustained his shoulder injury. Inquiries to other trucking companies whose trucks were on ITT's premises during the relevant time period did not reveal the identity of the trucker whom Miller alleged assisted him in moving the unit.

According to Miller's supervisor, Doreen Nawojski, Miller was assigned to a UPS machine on March 18, 1996, and she did not observe Miller manually moving any equipment. Miller went to ITT on March 22, 1996, and completed a work accident report. Miller claims that when returned to work on March 25, 1996, he was forced to perform his regular duties, although light duty assignments, which he was supposed to receive, were available.

Miller was suspended from work on April 28, 1996 and was terminated on April 18, 1996. On July 20, 1996, Miller applied for workers' compensation benefits. Miller filed a grievance with the Union regarding his discharge. The Union investigated the grievance, but ultimately decided not to pursue it to arbitration as the lack of evidence in Miller's favor rendered his case weak.

### Terry Williams

Plaintiff Terry Williams ("Williams"), commenced working for ITT in October 1984, and was employed as a machinist at the time of his discharge. Williams was previously discharged in 1994 for poor attendance. Williams's absentee rate between 1987 to the date of his discharge in

1994 ranged from 11% to 69%. Williams attributes his high rate of absenteeism to his history of several medical problems, "including a blood disorder in 1995, a collapsed lung suffered at work in 1992, a smashed foot suffered at work, gastritis, carpal tunnel syndrome, and a chronic central disk protrusion—C5 and C6 degeneration that continues to this date." Plaintiffs' Memorandum at 7 (citing Williams Deposition Testimony at 20–24; Williams's Affidavit, ¶ 2).[6] The Union pursued a grievance related to Williams's 1994 discharge to arbitration, eventually reaching a settlement providing for Williams to be reinstated as of April 21, 1995, with some back pay and benefits.

Following Williams's reinstatement, ITT disciplined Williams for three days in May 1996 for insubordination and use of abusive language. Williams was also indefinitely suspended in July 1996 for threatening a supervisor. After that suspension, the Union intervened and secured Williams's reinstatement on July 18, 1996, with a final warning.

Williams called in sick on September 13, 1996. Williams remained ill on September 14, 1996, but did not inform ITT he would not be reporting to work that day. Nor did Williams call in on his next two scheduled work days, i.e., September 16 and 17, 1996, which he also missed based on illness. Williams also failed to report to work as scheduled on September 18, 1996, although he did call in at 11:30 A.M. to report his absence.

The parties do not dispute that the CBA agreement contains a "48–hour call in" provision which provides:

Seniority shall be broken and employment terminated for any of the following reasons:

*　　*　　*　　*　　*　　*

(b) Failure to notify the Company within forty-eight (48) hours after the start of his shift of the reason for any absence. The forty-eight (48) hour call-in requirement shall be reinstituted any time an employee fails to return to work as reported by his most recent call-in. This shall not apply if failure to notify the Company was for good cause.

CBA, Art. VI, § 6.03(b) ("§ 6.03(b)") (attached as Ex. A to Masocco Affidavit).

On September 18, 1996, ITT indefinitely suspended Williams on the basis that his failure to call in was a clear violation of § 6.03(b). Williams maintains that he has demonstrated good cause for violating § 6.03(b), specifically, that on September 16, 1996, he sought medical treatment from his physician who prescribed medication which made Williams drowsy and rendered Williams, who did not have a telephone, unable to walk to the nearest public telephone, located several blocks from his home, to call in and report his absence from work. In support of his position, Williams presented a note from his physician verifying that Williams's medication would make him drowsy. Nevertheless, on October 1, 1996, ITT terminated Williams.

Williams filed a grievance which the Union attempted to settle. However, the Union ultimately determined there was no merit to the grievance, particularly in light of the final warning issued in July 1996, and withdrew the grievance.

### *DISCUSSION*

#### 1. *Motion to Strike*

Initially, the court addresses Defendant ITT's motion to strike. In its reply papers

---

**6.** Relevant portions of the transcript of Williams's Deposition Testimony are attached as Exhibit M to Plaintiffs' Rule 56 Fact Statement.

in further support of summary judgment, ITT contends that Plaintiffs, in response to Defendants' summary judgment motions, cite to many pages of deposition testimony which are not among Plaintiffs' response papers. Perry Reply Affidavit, ¶ 3 and attached Ex. D. As a sur-reply, Plaintiffs filed an attorney affidavit, Sanders Affidavit II, attached to which are exhibits containing the missing pages to which Plaintiffs refer in their response papers. ITT moved to strike the affidavit and the attached exhibits as untimely submitted or, alternatively, for an order permitting ITT to submit additional papers addressing such submissions.

In support of the motion to strike, ITT argues that Plaintiffs submitted the missing pages of deposition testimony referenced in Plaintiffs' response papers more than 30 days after the Scheduling Order dated December 7, 1999 (Docket Item No. 23)[7] permitted. Perry Affidavit in Support of Motion to Strike, ¶¶ 2–3. Plaintiffs have not moved for permission to submit the additional papers, nor have they provided any reason or demonstrated good cause for failing to timely file such papers. *Id.*, ¶ 4. ITT further maintains that consideration of Plaintiffs' late submissions without providing Defendants an opportunity to respond is unfair. *Id.*, ¶¶ 5–6. Alternatively, ITT asks for permission to submit additional papers addressing Plaintiffs' late submissions. *Id.*, ¶ 7.

In response, Plaintiffs argue that their late submissions contain no new arguments but, rather, consist only of excerpts from deposition transcripts previously referenced in Plaintiffs' Memorandum of Law and Plaintiffs' Rule 56 Fact Statement and were intended to be annexed to such papers when originally filed. Sanders Affidavit Opposing Motion to Strike, ¶¶ 2–3.

Plaintiffs further assert such late submissions have not resulted in prejudice to ITT as ITT was in possession of the referenced deposition transcripts and has responded to Plaintiffs' arguments relative to such submissions. *Id.*, 3. Accordingly, Plaintiffs provided the referenced missing pages for the court's consideration. *Id.*

In an attorney affidavit subsequently filed on July 28, 2000, Plaintiffs advised the court that ITT had rehired a former white employee who had been terminated for violating the 48 hour rule, whose attendance record allegedly was worse than Williams's, who had prior terminations for workplace violence, and who had signed a "last chance agreement." Sanders Supplemental Affidavit, ¶ 2. Defendant ITT also requests the court strike this most recent submission as Plaintiffs did not seek permission from the court to file papers for which the court's scheduling order makes no provision. Perry Declaration Opposing Plaintiffs' Second Untimely Submission, ¶ 4. ITT further objects to the fact that the affidavit is based upon Plaintiffs' attorney's "personal knowledge or upon information and belief," *id.*, ¶ 2, arguing that such statements suggest Sanders is a witness in this case. *Id.*, ¶ 6.

■ District courts may grant extensions of time in purely procedural matters upon a showing of "excusable neglect." Fed.R.Civ.P. 6(b)(2); *LoSacco v. City of Middletown,* 71 F.3d 88, 93 (2d Cir.1995) (upholding district court's enlargement of time for attorney to file bill of costs of time on ground of excusable neglect where counsel awarded attorney fees was on vacation when circuit court affirmed award, and bill of costs was filed nine days late). " '[E]xcusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limit-

---

7. This court's Scheduling Order filed December 7, 1999, requires all papers relevant to the pending summary judgment motions be filed by February 21, 2000.

ed strictly to omissions caused by circumstances beyond the control of movant.' Rather, it may encompass delays 'caused by inadvertence, mistake or carelessness,' at least when the delay was not long, there is no bad faith, there is no prejudice to the opposing party, and movant's excuse has some merit." *LoSacco, supra* (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.,* 507 U.S. 380, 388, 392, 394–95, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). In the instant case, the court will not strike Plaintiffs' late submissions consisting of pages of the deposition testimony omitted from Plaintiffs' original response papers filed in opposition to summary judgment, but will strike Plaintiffs' later submissions filed July 28, 2000, regarding the alleged rehiring of a former ITT employee.

■ Plaintiffs' failure to attach the relevant pages of deposition testimony to their original responding papers qualifies as excusable neglect under the factors articulated in *Pioneer, supra,* and *LoSacco, supra.* Specifically, such failure was the result of "inadvertence, mistake or carelessness." The delay was not unduly long. In fact, although ITT maintains that such papers were filed more than 30 days after the February 21, 2000 deadline, Perry Affidavit in Support of Motion to Strike, ¶¶ 2–3, the court takes judicial notice that according to the 2000 calendar which depicts February as having 29 days, Plaintiffs' submissions, filed on March 22, 2000, were filed exactly 30 days late. There is no indication the delay was the result of bad faith, and ITT neither argues otherwise, nor points to anything indicating bad faith.

Plaintiffs further explain, and ITT does not challenge, that the failure to provide the missing deposition testimony pages earlier caused ITT no prejudice. The papers merely provide the asserted documentation Plaintiffs referenced in their responding papers and contain no new arguments. ITT does not deny that they have the entire deposition transcripts. Nor does ITT maintain that Plaintiffs' failure to provide the information rendered it unable to respond to any of Plaintiffs' response arguments.

Finally, although Plaintiffs have not clearly expressed any excuse for the failure to timely submit the missing papers, implicit in their response is that they were inadvertently omitted, an excuse which has some merit. On this record, the court will consider such late submissions on the basis that Plaintiffs' failure to attach them to their original response papers qualifies under Fed.R.Civ.P. 6(b) as excusable neglect.

■ However, Plaintiffs' later submission regarding the alleged rehiring of a former white ITT employee with a track record similar to Williams, will be stricken. This affidavit, which is made by the Plaintiffs' attorney and upon information and belief, contains no explanation for the allegations and, as such, consists of only bald assertions. Permitting such an affidavit to be considered in this case would be unduly prejudicial to ITT.

As such, Defendant ITT's motion to strike is DENIED as to the late filing of Plaintiffs' exhibits originally omitted from their response papers filed in opposition to summary judgment (Docket Item No. 31), and GRANTED as to Plaintiffs' later submission regarding the rehiring of a former ITT employee (Docket Item No. 34).

### 2. *Summary Judgment*

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra*, at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra*, at 247–48, 106 S.Ct. 2505. Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. "Summary judgment is sparingly used where intent and state of mind are at issue, ... [as] careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Graham v. Long Island Rail Road*, 230 F.3d 34, 38 (2d Cir.2000) (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 103 (2d Cir.1989), *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999); *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994), and *Gallo v. Prudential*

*Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir.1994)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Catrett, supra*, at 323–24, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra*, at 18 (citing cases). Where the burden of proof on an issue for which summary judgment is sought is on the movant, should the movant fail to meet its initial burden of establishing the absence of any genuine issue of material fact as to

that issue, the non-movant will prevail even if the non-movant submits no evidentiary matter establishing there is indeed a genuine issue for trial. *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir.1985).

Both Defendants have moved for summary judgment of all claims Plaintiffs have asserted against them in connection with the Company's termination of their employment. As stated, all Plaintiffs assert Defendants racially discriminated against them in violation of § 1981 (First Cause of Action). Plaintiff Williams also asserts Defendants discriminated against him on the basis of race, in violation of Title VII (Second Cause of Action), and disability, in violation of the ADA (Third Cause of Action). All Plaintiffs assert Defendants discriminated against them in violation of New York Human Rights Law on the basis of race, while Plaintiffs Miller and Williams also assert disability as the basis for alleged discrimination under that statute (Fourth Cause of Action).

Claims of employment discrimination under Title VII are subject to a burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff bears the initial burden of establishing a *prima facie* case of unlawful discrimination. *Hicks, supra*, at 506–07, 113 S.Ct. 2742. Upon such a showing, it is the defendant's burden to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 507, 113 S.Ct. 2742. The ultimate burden of production then shifts back to the plaintiff to demonstrate " 'that the proffered reason was not the true reason for the employment decision.' " *Hicks, supra*, at 508, 113 S.Ct. 2742 (quoting *Texas Dept. of Community Affairs v. Bur-*

*dine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ To establish a *prima facie* case of discriminatory discharge in violation of Title VII or § 1981, a plaintiff must demonstrate that (1) he belongs to a protected class, (2) he was performing his duties satisfactorily, (3) he was discharged, and (4) his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997) (citing *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995); *Chambers, supra*, at 37; and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989)). A plaintiff's burden to establish a *prima facie* case of employment discrimination to defeat summary judgment is *de minimus*. *McLee, supra*, at 134 (citing cases). As the court may not resolve issues of fact on a summary judgment motion, its determination is limited to "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *McLee, supra*, at 135.

■ Where a case turns on the fourth factor of the *McDonnell Douglas* burden-shifting test, *i.e.*, whether an adverse employment decision occurred under circumstances giving rise to an inference of discrimination, such inference may be established by "showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham, supra*, at 38 (citing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999)). Whether two employees are similarly situated ordinarily presents a question of fact for the jury.

*Graham, supra,* at 38 (citing cases). The Second Circuit applies an "all material respects" standard in determining whether two employees are similarly situated. *Graham, supra,* at 39–40. In particular, the standard varies from case to case and

> must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. In other words, there should be an objectively identifiable basis for comparability. Hence the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.

*Id.* (citing cases) (internal quotation omitted).

█ Further, a showing under the fourth requisite step to establishing a *prima facie* case of employment discrimination that employees belonging to one racial group received more favorable treatment than similarly situated employees belonging to a different racial group can also serve as evidence that the employer's proffered legitimate non-discriminatory reason for an adverse job action was a pretext for racial discrimination. *Graham, supra,* at 43 (citing *Hargett v. National Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.1996)). A jury's finding that the facts demonstrate disparate treatment of similarly situated employees belonging to different racial groups could also support a finding that the employer's articulated non-discriminatory reason for the adverse employment action was pretextual, thereby precluding summary judgment under the third prong of the *McDonnell Douglas* burden-shifting test. *Graham, supra* (cit-

ing *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998)).

█ The *McDonnell Douglas* burden-shifting test also applies to claims under § 1981, *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996), and the ADA, *Roberts v. New York State Department of Correctional Services,* 63 F.Supp.2d 272 (W.D.N.Y.1999). Furthermore, as New York courts require the same standard of proof for claims brought under New York Human Rights Law as those brought under Title VII, *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995), Plaintiffs' claims under New York Human Rights Law are subject to the same legal analysis as their Title VII claims.

█ As a threshold matter, the court notes that much of the evidence Plaintiffs submit in opposition to summary judgment is insufficient to overcome Defendants' motions. In particular, on issues where the non-moving party has the burden of proof, the Plaintiff must provide more than conclusory and self-serving statements in affidavits to avoid summary judgment. *Goenaga, supra,* at 18. Also, statements which are nothing more than hearsay are insufficient. *Sarno v. Douglas–Elliman Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) (holding hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment); *See Raskin v. Wyatt Company,* 125 F.3d 55, 66 (2d Cir.1997) (holding court need consider only admissible evidence when considering summary judgment motion). For example, Plaintiffs refer to numerous statements made in their depositions and affidavits as creating genuine issues of material fact, rendering summary judgment inappropriate. *See, e.g.,* Plaintiffs' Memorandum at 10–11 (citing Williams's Deposition Testimony at 225–29 as establishing that Williams was paid less than a white

employee with less seniority; Miller Deposition Testimony[8] at 140 as establishing that Miller had been disciplined for excessive scrap material as compared to white employees; Lee Deposition Testimony[9] at 219–23 and Lee Affidavit, ¶ 7 as establishing that Lee heard union representative Gary Majchrczak make racially derogatory statements on several occasions). Such statements that are not corroborated by other evidence will not be considered with regard to any issue on which Plaintiffs have the ultimate burden of proof. *Sarno, supra,* at 160.

### 3. *Claims Against Union* [10]

Plaintiffs' claims with regard to the Union are essentially that the Union breached its duty of fair representation with regard to the conduct on which Plaintiffs' employment discrimination claims against ITT are predicated, because of Plaintiffs' race. Defendant Union argues Plaintiffs have failed to state a claim against the Union and, alternatively, that such claims are time-barred. Defendant Union's Memorandum of Law at 11–16. The Union specifically maintains that Plaintiffs have failed to state a claim against the Union, the Union maintains that each Plaintiff admits he never complained to the Union or to the Joint Civil Rights Committee about the alleged discrimination, and that Plaintiffs have failed to identify any of the alleged discriminato-

ry practices that occurred within the applicable statute of limitations period. *Id.*

The court addresses the Union's statute of limitations argument first. Defendant Union maintains that Plaintiffs' claims as against the Union are time-barred. Defendant Union's Memorandum at 15–17. The statute of limitations for a breach of a fiduciary duty is six months, *DelCostello v. Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), and a cause of action against a labor union based on the union's alleged breach of its duty to fairly represent its members accrues "no later than the time when the plaintiff knew or reasonably should have known that such a breach occurred, even if some possibility of nonjudicial enforcement remained." *Santos v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of America, AFL–CIO,* 619 F.2d 963, 969 (2d Cir.1980).

In this case, the last alleged discriminatory event by the Union as to any of the three Plaintiffs occurred on September 18, 1996 when the Union advised Miller that it was withdrawing his grievance based upon the recommendation of Richard Corcoran and the lack of facts contradicting ITT's claims that Miller had falsified his workers' compensation claim. As this action was not filed until March 17, 1998, more than six months after the last alleged discriminatory event, the claims

---

8. Relevant portions of the transcript of Miller's Deposition Testimony are attached as Exhibit L to Plaintiffs' Rule 56 Fact Statement.

9. Relevant portions of the transcript of Lee's Deposition Testimony are attached as Exhibit K to Plaintiffs' Rule 56 Fact Statement.

10. Plaintiffs do not allege the Union breached its duty to fairly represent its members under § 301 of the Labor and Management Relations Act of 1947 as amended ("LMRA"), 29

U.S.C. § 141 *et seq.,* but, rather, assert claims against the Union under 42 U.S.C. § 1981, Title VII, the ADA and New York Human Rights Law. As such, liability may lie against the Union absent a finding of liability against the employer under these same statutes. *Compare Vaca v. Sipes,* 386 U.S. 171, 186–87, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (holding suit against employer for breach of CBA is necessary to prove subsequent claim for unfair labor practice against Union for failure to arbitrate).

against the Union would be time-barred if brought under § 301 of the LMRA.

However, Plaintiffs argue that they did not assert any claims against the Union under § 301 of the LMRA. Rather, Plaintiffs assert the same claims against the Union as they assert against ITT, *i.e.,* claims brought under Title VII, 42 U.S.C. § 1981, the ADA and New York Human Rights Law, N.Y. Exec. Law § 296. Plaintiffs' Memorandum at 20. As such, Plaintiffs maintain that the applicable statutes of limitations are three years for § 1981 and New York Human Right Law claims and 300 days for ADA and Title VII claims. *Id.* The Union has not replied to Plaintiffs' response on this issue.

Courts within the Second Circuit have held that

> a union may also face liability under Title VII, § 1981, and the ADA if it breaches its duty of fair representation. As to such claims, the statute of limitations under Title VII, § 1981, and the ADA—not the six-month statute of limitations for breach of duty of fair representation—controls.

*Nweke v. Prudential Ins. Co. of America,* 25 F.Supp.2d 203, 219 (S.D.N.Y. 1998) (citing *Blaizin v. Caldor Store # 38,* 1998 WL 420775, at *2 (S.D.N.Y. July 27, 1998) (applying Title VII statute of limitations period for claim that union, by failing to represent plaintiff on grievance, endorsed employer's discriminatory actions); *Morris v. Amalgamated Lithographers of Am., Local One,* 994 F.Supp. 161, 171 (S.D.N.Y.1998) (holding Title VII retaliation claim barred under 300–day statute of limitations); and *Campbell v. General Motors Corp.,* 1989 WL 152720, *3 (W.D.N.Y. July 7, 1989) ("A claim for racially discriminatory failure to represent would ... be accorded the three year statute of limitations applicable to § 1981 claims, rather than

the brief six-month statute applicable to generic violations of the duty of fair representation")).

■ Further, the Supreme Court has acknowledged that "certain private entities such as *labor unions,* which bear explicit responsibilities to process grievances, press claims and represent members in disputes over the terms of binding obligations that run from the employer to the employee, are subject to liability under § 1981 for racial discrimination in the enforcement of labor contracts." *Patterson v. McLean Credit Union,* 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132(1989) (emphasis added). The distinction between a claim that a union breached its duty of fair representation in violation of § 301, and a claim for racially discriminatory failure to represent under § 1981 "is the presence or absence of a discriminatory intent proscribed by § 1981." *Campbell, supra,* at *3.

■ The relevant statute of limitations is three years for § 1981 and New York Human Rights Law claims. *Tadros v. Coleman,* 898 F.2d 10, 12 (2d Cir.) (three-year statute of limitations applies to § 1981 claim), *cert. denied,* 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149 (1990); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2nd Cir.1996) (citing N.Y. Civ. Prac. L. & R. 214(2) as providing three-year limitations period for claims under New York Human Rights Law). Accordingly, the § 1981 and New York Human Rights Law claims are not barred as to any of the Plaintiffs.

■ For Title VII and ADA claims, the statute of limitations is 300 days. *Van Zant, supra,* at 712 ("A complaint alleging discrimination under Title VII must be filed with the EEOC 'within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge

with a state or local equal employment agency, within 300 days of the alleged discriminatory action.'"); *Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir. 1999) (acknowledging that 42 U.S.C. § 12117(a) provides for a 300–day limitations period for ADA claims by incorporating by reference 42 U.S.C. § 2000e-5). Here, the longer, 300–day statute of limitations for ADA and Title VII claims applies only to Williams's claims asserted under those statutes, as he is the only one who exhausted the administrative remedies which are a prerequisite to such claims.

■ Claims under the ADA and Title VII must also be filed within 90 days of the plaintiff's receipt of the EEOC's Notice of Right to Sue and, absent evidence to the contrary, it is presumed that the notice is received within three days of the date it was mailed by the EEOC. *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984), and *Sherlock v. Montefiore Medical Center*, 84 F.3d 522, 526 (2d Cir.1996). In the instant case, as the EEOC sent its Notice of Right to Sue to Williams on December 23, 1997, Williams's ADA and Title VII claims, filed on March 17, 1998, were timely filed. Nevertheless, the claims against the Union should, on their merits, be dismissed as to Plaintiffs Miller and Williams, but not as to Lee.

■ Regardless of whether Plaintiffs claim the Union breached its duty of fair representation under § 301 of the LMRA, or that the Union's motive for such breach was discriminatorily motivated in violation of Title VII, New York Human Rights Law, § 1981 or the ADA, the same test applies. *Nweke, supra*, at 220–221 (citing cases). "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Air Line Pilots Association v. O'Neill*, 499 U.S. 65, 67, 111

S.Ct. 1127, 113 L.Ed.2d 51 (1991) (citing *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)). To state a claim for breach of a union's duty of fair representation, Plaintiffs must establish that the Union breached its duty of fair representation and that the employer violated the collective bargaining agreement. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 572, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). However, although "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, ... the individual [does not have] an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca, supra*, at 191, 87 S.Ct. 903. To establish a *prima facie* case that the Union breached its duty of fair representation the Plaintiffs must satisfy a two-prong test including (1) that the Union breached its duty of fair representation by allowing an alleged breach of the collective bargaining agreement to go unrepaired, *i.e.*, by failing to pursue a union member's grievance to arbitration, and (2) that the Union's actions were motivated by discriminatory animus. *Nweke, supra*, at 221 (citing *Morris v. Amalgamated Lithographers of America, Local One*, 994 F.Supp. 161, 170 (S.D.N.Y.1998)).

■ Nor does a union's good faith, non-arbitrary failure to take an action that is unlikely to be advantageous subject it to liability for breach of its duty of fair representation. *Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 44 (2d Cir.1989) (citing *Vaca, supra*, at 190, 87 S.Ct. 903), *cert. denied*, 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989). Instead, "'[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.'"

*White v. White Rose Food,* 237 F.3d 174, 179 (2d Cir.2001) (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Provided the union's decision not to pursue arbitration was not arbitrary and was made in good faith, the union's decision is accorded non-actionable discretion. *O'Neill, supra,* at 78, 111 S.Ct. 1127. The test is whether the union's conduct or omissions is "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary," *N.L.R.B. v. Local 282, International Brotherhood of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984), and allegations of negligence or errors by a union in processing grievances are insufficient. *United Steelworkers of America v. Rawson,* 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (mere negligence does not state a claim of unfair representation); *Barr, supra,* at 43 (tactical errors such as failing to present witnesses and inadequate representation by union business agent insufficient to demonstrate bad faith or arbitrariness). Further, although a union typically has broad discretion in deciding whether to process a grievance, *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 567–68, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), that discretion is not unlimited and must be "rationally founded." *Barr, supra,* at 44.

▮ Here, Defendant Union first asserts that none of the Plaintiffs has ever complained to the Union that ITT has denied them certain job opportunities, manipulated the layoff and bumping procedure to bump Plaintiffs from higher-paying jobs, or compensated Plaintiffs at lower rates than white employees received for the same work. Defendant Union's Memorandum at 11. Nor has any Plaintiff identified that any such incident occurred within the relevant limitations period. *Id.* Plaintiffs do not dispute this fact and, as such, the Union cannot be held liable for failing to arbitrate such claims, and the court will not further discuss them.

The Union also asserts that its decision not to pursue Plaintiffs' discharges to arbitration was based not on any discriminatory motive but, rather, was based on either an appraisal of the merits of Plaintiffs' cases, or on honest mistakes in judgment. Defendant Union's Memorandum at 14. In support of its argument, the Union states that during the period 1987 through 1996, the Union arbitrated three ITT employee discharge cases, two involving African American employees [11] and one involving a white employee. *Id.* The Union maintains that it negotiated last chance agreements for white, as well as African American employees. *Id.* Finally, the Union maintains that in the instant cases it was confronted with terminations for serious infractions or, in Williams's case, a clear cut termination of the express terms of the CBA, and that the Plaintiffs' disciplinary records were "less than exemplary." *Id.* at 15.

Guy Masocco, who served as Union President of Local 897 between 1991 and 1997, and as Grievance Committee Chairman for 12 years prior to becoming president, recites in an affidavit submitted in support of the Union's summary judgment motion several steps taken by the Union on each Plaintiff's behalf following ITT's discharge. Masocco Affidavit, ¶ 2. Masocco maintains that as Union president, he was involved in the Union's investigation and decision-making processes regarding

---

**11.** According to the Union, one of the discharge cases involving an African American employee which the Union pursued to arbitration was Plaintiff Williams's 1994 termination. Defendant Union's Memorandum at 14.

the grievances Plaintiffs lodged upon their discharge. *Id.,* ¶¶ 4, 11.

Initially, Masocco, on behalf of the Union, challenges as untrue Plaintiffs' contention that since 1987, the Union has had only one African American steward and no African American officers. Masocco Affidavit, ¶ 8. According to Masocco, between 1987 and 1996, Roe Harrison, who is African American, served as Union steward and was also Chairman of the Grievance Committee for many of those years. *Id.* Other African Americans who served as Union officers during the relevant period include Richard Miller, Martin Smith and Virginia Mills. *Id.*

In response, Plaintiffs maintain that although two of the three cases arbitrated by the Union in recent years involved African Americans, ITT did not take disciplinary action against white employees as often as against African American employees, that disciplinary issues concerning white employees were often resolved without arbitration and, thus, there was less need for the Union to seek arbitration for white employees. Plaintiffs' Memorandum at 20. Plaintiffs further argue that "[t]he fact that the Union was less inclined to pursue grievances on behalf of African Americans is not surprising, in light of the fact that few Union officials have been African American." *Id.* However, Plaintiffs point to nothing in the record that supports these assertions on which Plaintiffs bear the burden of proof. For example, although Plaintiffs assert that "the bias of the Union's grievance chairman is specifically shown by his own comments," *id.,* Plaintiffs fail to specify to what comments such statement refers. Plaintiffs do not even identify the Union grievance chairman who allegedly made such com-

ments and such assertion is not clearly apparent from the record. Masocco's statement that he was the Chairman of the Union's Grievance Committee for approximately 12 years before becoming President of the Union in 1991, implies that he was not the Union's Grievance Chairman when any of the Plaintiffs were terminated nor during the period of many of the alleged discriminatory acts. Further, a careful reading of Masocco's affidavit does not reveal any statement which could be construed as evidencing bias. *See Masocco Affidavit, in passim.*

Masocco first recounts Lee's long disciplinary record with ITT and its successor, since Lee was hired in April 1977. Masocco Affidavit, ¶ 24. That history includes six suspensions for such violations as abusive language, insubordination, threats to supervisors, poor attendance and poor work performance. *Id.,* ¶ 24. Lee had also been previously discharged for poor attendance and insubordination. *Id.* In connection with his prior discharges, Lee filed grievances which the Union pursued to arbitration. *Id.* ITT, the Union and Lee reached a settlement for the grievance related to the second discharge providing for Lee's reinstatement upon his execution of a last chance agreement.[12] *Id.* Lee, however, claims with regard to his most recent discharge pursuant to the Last Chance Agreement that the Union's failure to arbitrate his grievance was an act of bad faith.

The record shows that the Union took steps to inform itself of the underlying facts as to Lee's termination. In particular, on March 19, 1996, Lee was suspended by ITT for leaving work without authorization. Masocco Affidavit, ¶ 25. Following a

---

**12.** A copy of Lee's last chance agreement ("Lee's Last Chance Agreement") is attached as Exhibit D to Masocco Affidavit.

meeting with Lee, ITT and the Union on March 25, 1996, ITT discharged Lee effective that day. *Id.,* ¶ 26. Masocco maintains that the Union's investigation revealed that when Lee could not find his time card upon reporting to work on March 19, 1996, he left the plant and told ITT security that if ITT wanted him to work that day, he could be reached at home. *Id.,* ¶ 27. Lee subsequently telephoned the Union's office, was asked to come in to work, and Lee responded that ITT could call him if they wanted him to work. *Id.,* ¶ 28. According to Masocco, it was the Union's opinion that there was no reason why Lee could not have signed in and waited until the issue of the missing time card was resolved. *Id.* The Union also decided that given Lee's disciplinary record and the fact that he was working pursuant to a last chance agreement, it would not pursue Lee's case, and the Union advised Lee of its decision on April 12, 1996. *Id.,* ¶ 29.

However, Lee's execution of the Last Chance Agreement did not excuse the Union from its duty to fairly represent Lee on his grievance filed subsequent to termination. A last chance agreement is enforceable against the Union and the employee as an amendment to the collective bargaining agreement, and may circumscribe the scope of review which would otherwise be available to an arbitrator in considering a grievance. *Coca–Cola Bottling Company v. Teamsters Local Union No. 688,* 959 F.2d 1438, 1442 (8th Cir. 1992); *Tootsie Roll Industries Inc. v. Local Union No. 1,* 832 F.2d 81, 84 (7th Cir.1987); *Gargiulo v. Castle Coal & Oil Co., Inc.,* 1992 WL 331108, *2 (S.D.N.Y. Nov.5, 1992). Although a last chance

agreement may well place beyond the reach of arbitrator issues that might provide the basis of relief, *see, e.g., Tootsie Roll Industries, supra,* it is also clear that the employee does not waive his right to an arbitrator's determination of whether the disputed conduct actually constitutes a violation of the agreement. *See United Steelworkers v. Lukens Steel Co.,* 969 F.2d 1468 (3d Cir.1992) (holding last chance agreement did not preclude arbitration of alleged violation of the agreement). Further, Lee's Last Chance Agreement does not mandate dismissal upon a violation, *Smith v. ITT Standard,* 834 F.Supp. 612, 619–20 (W.D.N.Y.1993), and Shine admitted as much. Shine Deposition Testimony at 44.[13]

In this case, the court finds that the Union's decision not to arbitrate Lee's grievance was arbitrary insofar as the decision was based on Lee's execution of the Last Chance Agreement. Specifically, Lee's Last Chance Agreement was executed following Lee's termination in January 1995 for violating ITT's Shop Rules by refusing Shine's directives and the Work Place Violence Policy by threatening Shine with physical harm. Lee's Last Chance Agreement provides for Lee's discharge upon any violation of ITT's Shop Rules 1(a)–(*l*) or Work Place Violence Policy within two calendar years of his reinstatement, and the only issue which may be grieved is whether Lee in fact committed the claimed violation. Lee's Last Chance Agreement, § 4. However, Shine admitted in his deposition that the Last Chance Agreement does not mandate discharge upon a violation. Shine Deposition Testimony at 44.[14]

---

**13.** Relevant portions of the transcript of Shine's Deposition Testimony are attached as Exhibit as Exhibit N to Plaintiffs' Rule 56 Fact Statement.

**14.** Relevant portions of Shine's Deposition Testimony Transcript are attached as Exhibit N to Plaintiffs' Rule 56 Statement (Docket Item No. 25).

The issue with regard to Lee's Last Chance Agreement is whether a genuine issue of material fact exists upon which a jury could conclude that the Union arbitrarily determined it could not succeed in arbitration of Lee's grievance. In this case, it is not clear from the record precisely what ITT Shop Rule or which provision of the Work Place Violence Policy Lee violated by leaving work upon discovering that his time card was missing.[15] There is no indication that either the security guard who told Lee not to leave work because his time card was missing, or the Union representative who advised Lee to return to work after leaving had any authority over Lee, rendering Lee's leaving work an act of insubordination. Nor is there any indication that ITT has ever disciplined any other employee for similar conduct. Furthermore, Lee explained that he left ITT's plant on March 19, 1996 not only because his time card was missing but, also, because he was returning to work after a period of disability and was not sure to what job he was assigned and, thus, did not know to what department he was to report, that no one who could provide him with such information would be at the plant for approximately 90 minutes, and that he believed a better use of that time would be to run an errand, *i.e.*, bringing prescription medicine to his wife. Lee Affidavit, ¶ 5. This explanation, considered in the light most favorable to Lee as the party opposing summary judgment, is not entirely implausible, and therefore establishes a material issue of fact regarding whether there was any basis to find either that Lee violated the Last Chance Agreement or that the Union acted arbitrarily in failing to take those question to arbitration.

While a court may not speculate as to what result may have been achieved had the union pursued arbitration, what an arbitrator reasonably could have considered in reaching a conclusion is relevant to the issue of whether ITT may be liable to Lee on his other claims as how an employer has previously interpreted its collective bargaining agreement may be based upon the "practice, usage and custom pertaining to ... such agreement[s]." *Transportation–Communication Employees Union v. Union Pacific Ry. Co.*, 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966); *Achilli v. John J. Nissen Baking Co.*, 989 F.2d 561, 563–64 (1st Cir.1993) (holding disparate treatment of employees as to similar alleged misconduct relevant). Although Lee's Last Chance Agreement may have removed the question of the propriety of Lee's termination based on his leaving work on March 19, 1996, assuming a factual predicate for such sanction existed, it did not waive Lee's right to contest whether the alleged misconduct constituted a violation of ITT's Shop Rules or its Work Place Violence Policy as a basis for finding that Lee had breached the Last Chance Agreement. If a jury resolved these issues in Lee's favor, it could also conclude that the Union arbitrarily accepted ITT's version in deciding not to pursue Lee's grievance.

That Lee's Last Chance Agreement may justify termination does not foreclose arbitration as to whether Lee violated any ITT Shop Rule or Work Place Violence Policy provision. Lee's past disciplinary record, while relevant to the issue of the appropriate sanction, is not relevant to whether Lee violated a Shop Rule or the Work Place Violence Policy. As such, the Union's belief that the mere existence of

---

**15.** Neither party has provided the court with a copy of ITT's Shop Rules or its Work Place Violence Policy.

Lee's Last Chance Agreement, coupled with his past disciplinary record, precluded any reasonable possibility of success in arbitration does not foreclose a finding that such belief constituted an arbitrary decision. Accordingly, the Union's motion for summary judgment as against Lee should be DENIED.

■ As to Plaintiff Miller, Masocco contends that upon Miller's suspension on March 28, 1996 for filing a false workers' compensation claim, the Union met with Miller and ITT. Masocco Affidavit, ¶ 14. ITT advised that it had contacted trucking firms that were at ITT on March 18, 1996, the date Miller alleged he sustained his shoulder injury, and that the drivers from those trucking firms had denied any injury incident involving lifting. *Id.* The Union then requested Miller provide medical records or other documents supporting his claim. *Id.* At a "Third Step" meeting conducted pursuant to the Union's CBA on April 15, 1996, Miller failed to produce further medical information other than a prescription and a "Return to Work" slip, ITT refused to reinstate Miller, and the Union filed a grievance on Miller's behalf. *Id.* at ¶ 15. On April 18, 1996, ITT terminated Miller's employment, the Union requested arbitration and also requested Miller provide medical documentation supporting his claim that his shoulder injury was work related. *Id.* at ¶ 16; Masocco Affidavit, Ex. B (Union grievance). Arbitration of the grievance was scheduled for September 10, 1996 and the Union scheduled a further meeting with Miller on September 3, 1996 to prepare for the meeting. Masocco Affidavit, ¶ 17. Miller did not attend the September 3, 1996 meeting, and the hearing was adjourned. *Id.*

On September 13, 1996, a meeting was held with Richard Corcoran, the United Steelworkers of America Assistant to the Director of District 4, and Miller to evalu-ate the case. Masocco Affidavit, ¶ 18. Miller produced a workers' compensation report dated July 19, 1996, on which his physician stated that he was informed in July 1996 that the shoulder injury Miller sustained on March 18, 1996 was work-related. *Id.* Upon reviewing the facts of the case with Miller and the Union Grievance Committee, Mr. Corcoran advised that Miller's case was weak and did not merit arbitration, and recommended Masocco attempt to secure Miller's reinstatement through a "last chance agreement." *Id.*, ¶¶ 19–20. Mr. Shine, however, would not agree to such reinstatement. *Id.*, ¶ 21. Upon further review of Miller's grievance by the Union Grievance Committee, the grievance was withdrawn in light of Corcoran's recommendation and the absence of evidence in Miller's favor rendered his case weak. *Id.*, ¶ 22.

The record sufficiently demonstrates the absence of any genuine issue of material fact that the Union's abandonment of Miller's grievance related to his termination was not arbitrary but, rather, was "rationally founded." *Barr, supra,* at 44. Notably, Miller points to no evidence to support his burden of production on this issue. It is arguable whether the rationale for refusing to pursue Miller's grievance was correct; however, such differences of view as to the strength of Miller's grievance do not establish the refusal was without reason. *Barr, supra,* at 43–44. As such, there exists no genuine issue of material fact on which, construed in Miller's favor, a jury could find that the Union failed to satisfy its duty to fairly represent Miller, either based on Miller's race or otherwise. Defendant Union's motion for summary judgment should be GRANTED as to Miller.

■ With regard to Williams's claim of discrimination based on disability and race in connection with his discharge in 1996,

Masocco states that ITT discharged Williams in May 1994 for poor attendance. Masocco Affidavit, ¶ 31. According to Masocco, Williams's absentee rate from 1987 to his date of discharge in 1994 was:

| 1987 | 11% |
| 1988 | 22% |
| 1989 | 26% |
| 1990 | 37% |
| 1991 | 27% |
| 1992 | 58% |
| 1993 | 46% |
| 1994 | 69% |

*Id.*

Upon Williams's discharge in 1994, the Union filed a grievance protesting the discharge. *Id.*, ¶ 32. As the parties were not able to settle the grievance, the Union proceeded to arbitration, *id.*, which resulted in an arbitrator's decision that the discharge was without just cause and gave the parties additional time to reach a settlement. *Id.*, ¶ 33. When the parties remained unable to reach final settlement the arbitrator, on June 14, 1995, issued a final award reinstating Williams effective as of April 21, 1995, with some back pay and benefits. *Id.*, ¶ 34.

After Williams returned to work, he was disciplined by ITT on several occasions including a three-day suspension in May 1996 for insubordination and abusive language, and an indefinite suspension in July 1996 for threatening a supervisor. Masocco Affidavit, ¶ 35. The Union intervened, securing Williams's reinstatement on July 18, 1996, accompanied by a final warning.[16] *Id.* On September 18, 1996, ITT indefinitely suspended Williams for violating § 6.03(b), the CBA's 48–hour call in provision.

The Union met with Williams and ITT on September 27, 1996 and, on October 1, 1996, ITT notified Williams that he was terminated effective that day. Masocco Affidavit, ¶ 37. Masocco maintains that the Union's investigation revealed that Williams called in sick on September 13, 1996. *Id.*, ¶ 38(a). Williams was still sick on September 14, 1996, but did not inform ITT he would not be reporting to work that day. *Id.*, ¶ 38(b). Williams did not call in on his next two scheduled work days, *i.e.*, September 16 and 17, 1996. *Id.*, ¶ 38(c). Nor did Williams report to work as scheduled on September 18, 1996, although he did call in at 11:30 A.M. to report his absence. *Id.*, ¶ 38(d). Masocco maintains that Williams's failure to call in to report his absence from scheduled work on September 14, 16 and 17 was a clear violation of § 6.03(b) absent any good cause shown excusing such failure, and that the Union requested Williams provide evidence of good cause. *Id.*, ¶ 38(e). Williams then advised the Union that on September 16, 1996, he sought medical treatment from his physician who prescribed medication which made Williams drowsy and rendered Williams, who did not have a telephone, unable to walk to the nearest public telephone, located several blocks from his home, to call in and report his absence from work. *Id.*, ¶ 38(f). Williams also presented a note from his physician verifying that Williams's medication would make him drowsy. *Id.*

During attempted settlement, the Union unsuccessfully argued Williams's excuse for failing to call ITT and report his absence, concluding that Williams violated § 6.03(b), and that his excuse for failing to call in was inconsistent with Williams's claim that he was able to visit his doctor, and the fact that Williams could have asked his brother to call in for him. Masocco Affidavit, ¶ 39. Upon review, the Union determined there was no merit to the grievance, particularly in light of the

16. No copy of Williams's Employee Warning Notice is in the record.

final warning issued in July 1996, and withdrew the grievance.

As stated, a court may not speculate as to what result may have been achieved had the union pursued arbitration, *Barr, supra*, at 44, and, provided the union's decision not to pursue arbitration was not arbitrary and was made in good faith, the union's decision is accorded discretion. *O'Neill, supra*, at 78, 111 S.Ct. 1127. Here, the record sufficiently demonstrates the absence of any genuine issue of material fact on which a jury could conclude that the Union breached its duty to represent Williams by failing to pursue his grievance to arbitration. Rather, the record shows, and Williams does not dispute, that Williams failed to inform ITT that he would not be reporting for scheduled work within 48 hours of such work. Nor does Williams argue that such failure was a violation of § 6.03(b). In opposition, Williams argues only that the Union failed to pursue arbitration on the issue of whether his excuse for not calling in, *i.e.*, that medication he had taken for his unspecified illness made him drowsy and, thus, unable to walk several blocks to a public telephone to call ITT, constituted good cause for failing to call in. However, the Union's position that it determined Williams's excuse was too weak to permit the Union to successfully pursue Williams's grievance to arbitration is "rationally founded." *Barr, supra*, at 44. The Union's opinion that based on Williams's purported reasons for failing to call in as required, even if arguable, are not without a basis in fact. *Id.* As such, no genuine issue of material fact exists upon which a jury could conclude that the Union's decision was arbitrary, such that the Union breached its duty to fair representation.

 Alternatively, even if it were possible for a jury to conclude, on these facts,

that the Union's decision not to pursue Williams's grievance to arbitration was arbitrary, Williams's claim against the Union would still fail as Williams has failed to demonstrate that such decision was motivated by discriminatory animus, which is demonstrated by facts indicating disparate treatment, that is, by demonstrating that white employees "similarly situated" to Williams with regard to the application of § 6.03(b) were treated more favorably than Williams. *Graham, supra*, at 39–40.

In this case, Williams has failed to make the necessary showing that the Union's decision not to pursue arbitration of his termination was racially motivated. Although Williams maintains that other white and non-disabled employees were not terminated for violating the 48–hour call-in rule, Plaintiffs' Memorandum at 18, Williams has not explained how those employees were similarly situated to Williams. In particular, Williams does not provide anything evidencing that a non-minority ITT employee with a similar disciplinary and attendance record, was not terminated for violating the 48–hour call-in rule. Nor does Williams argue that the Union has pursued arbitration of a non-minority employee's grievance arising from an employee's discharge for violating the 48–hour no-call rule on the basis that the same explanation for failing to call in proffered by Williams—that the medication he took for his unspecified medical condition rendered him unable to walk several blocks to the nearest public telephone—constituted good cause. Accordingly, the Union's motion for summary judgment as against Williams should be GRANTED.

On this record, the court finds that the Union's motion for summary judgment should be GRANTED as to Plaintiffs Miller and Williams, and DENIED as to Plaintiff Lee.

#### 4. *Claims Against ITT*

In their First Cause of Action, all three Plaintiffs allege ITT terminated their employment based on their race, in violation of 42 U.S.C. § 1981. In their Second Cause of Action, Plaintiff Williams asserts ITT terminated him based on his race in violation of Title VII. Williams also alleges in the Third Cause of Action that ITT terminated him on the basis of his disability in violation of the ADA. Finally, all three Plaintiffs assert in their Fourth Cause of Action that ITT terminated their employment based on their race in violation of New York Human Rights Law, and Plaintiffs Miller and Williams also allege termination in violation of New York Human Rights Law based on disability.

#### A. *Disability Claims*

#### 1. *ADA*

Plaintiff Williams alleges Defendants violated his rights under the ADA by terminating his employment based on Williams's failure to provide notice within 48 hours of being absent from work. Complaint, ¶¶ 44–47. Defendants argue in support of summary judgment that Williams is not a "qualified individual with a disability" under the ADA. Defendant ITT's Memorandum at 20–22.

■■■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a).

> "[T]o make a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability."

*Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149–50 (2d Cir.1998) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998)).

■■■ The Equal Employment Opportunity Commission ("EEOC"), has promulgated administrative regulations implementing the ADA. *Reeves, supra,* at 150 (citing 29 C.F.R. § 1630.2). As the EEOC is charged with administering the ADA, deference is accorded the EEOC's interpretation of the ADA. *Reeves, supra,* n. 3 (citing *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997)).

For an employer to be subject to the ADA, the employer must be "engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 29 C.F.R. § 1630.2(e)(1). The parties do not dispute that ITT is an employer subject to the ADA. As such, the court considers whether Williams has established he has a disability as defined under the ADA.

■■■ The ADA protects Williams only if he is a "qualified individual with a disability," 42 U.S.C. § 12112(a), which is defined as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . .

42 U.S.C. § 12111(8).

"Disability," as relevant to the ADA, means:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

 A physical impairment is defined in the EEOC regulations as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one of more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h)(*l* ). EEOC regulations regarding the ADA define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(*l*). "The ADA's requirements that, in order to constitute a disability under its terms, an impairment must substantially limit a major life activity underscores that 'the impairment must be significant, and not merely trivial.' " *Reeves, supra,* at 151 (emphasis in original and quoting *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 898 (10th Cir.1997)). Three factors to be analyzed in determining whether an impairment substantially limits a major life activity include: (1) the nature and severity of the impairment; (2) how long the impairment will last or is expected to last; and (3) the impairment's permanent or long-term impact or expected impact.

In this case, Williams alleges no mental impairment and his allegations pertaining to his physical impairments are, at best, vague. Specifically, Williams maintains that he has a history of several medical problems, "including a blood disorder in 1995, a collapsed lung suffered at work in 1992, a smashed foot suffered at work, gastritis, carpel tunnel syndrome, and a chronic central disk protrusion—C5 and

C6 degeneration that continues to this date." Plaintiffs' Memorandum at 7 (citing Williams Deposition Testimony at 20–24; Williams's Affidavit, ¶ 2). The record, however, is devoid of any evidence demonstrating which, if any, of Williams's alleged physical impairments, substantially limits any one or more of his major life activities. As such, Williams has failed to establish that he is a member of a protected class, the first step in the *McDonnell Douglas* burden-shifting test, and thus has not established a *prima facie* case of disability-based employment discrimination under the ADA. *Reeves, supra,* at 150. Defendant ITT's motion for summary judgment on this claim should, therefore, be GRANTED.

### 2. *New York Human Rights Law*

Plaintiffs Miller and Williams also alleged employment discrimination based on disability under New York Human Rights Law which, they maintain, defines the term "disability" more broadly. Plaintiffs' Memorandum at 15. ITT argues that even if Miller or Williams can establish he is disabled under New York Human Rights Law, neither plaintiff can meet the rest of his burden under the *McDonnell Douglas* burden-shifting test. Defendant ITT's Reply Memorandum at 5.

 The term "disability" under New York Human Rights Law is defined as

(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with

employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

N.Y. Exec. Law § 292(21).

Unlike the ADA, New York Human Rights Law does not require that the employee demonstrate that a physical or mental impairment substantially impairs a major life activity. *Reeves, supra,* at 155. Rather, for a physical impairment to qualify as a disability under New York Human Rights Law, "the condition may manifest itself in one of two ways: (1) by *preventing* the exercise of a normal bodily function or (2) by being 'demonstrable by medically accepted clinical or laboratory diagnostic techniques.' " *Reeves, supra,* at 155 (quoting N.Y. Exec. Law § 292(21)). Accordingly, a "literal reading of the statute [N.Y. Exec. Law § 292(21)], taking no account of the seemingly clear legislative purpose to enact a definition of disability coextensive with comparable federal statutes, treats a medically diagnosable impairment as necessarily a disability for purposes of the N[ew York Human Rights Law]." *Reeves, supra,* at 155.

The court, however, need not determine whether Miller and Williams qualify as "disabled" under New York Human Rights Law as they cannot meet the rest of the *McDonnell Douglas* burden-shifting test. In particular, ITT has articulated legitimate non-discriminatory reasons for discharging both Miller (falsification of a workers' compensation claim) and Williams (violation of § 6.03(b)). As such, the burden shifted to Plaintiffs to demonstrate such reasons were mere pretexts for the true reason—Plaintiffs' alleged disabilities. However, neither Miller nor Williams has submitted any evidence demonstrating

that the non-discriminatory reasons articulated by ITT for such discharges were mere pretexts.

As discussed, at the fourth step of the *McDonnell Douglas* burden-shifting test, the plaintiff is required to demonstrate that the employer subjected him to disparate treatment, that is, "treated him less favorably than a similarly situated employee outside his protected group." *Graham, supra,* at 39. Whether two employees are similarly situated ordinarily presents a question of fact for the jury. The Second Circuit applies an "all material respects" standard in determining whether two employees are similarly situated, and that standard is judged "based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham, supra,* at 39–40 (citing cases).

In this case, Miller must demonstrate he was treated less favorably than another ITT employee with a disability similar to a strained shoulder which lasted only a few days in duration, who committed an offense of comparable seriousness to falsifying a workers' compensation claim. However, Miller has made no such showing. Rather, Miller's opposition to summary judgment on this issue is merely comprised of a conclusory allegation that upon returning to work on March 25, 1996, following *his shoulder injury sustained on March 18, 1996,* he asked for a "light duty assignment," which were available, but that he was forced to perform his regular duties. Miller Affidavit, ¶ 9.

Significantly, Miller does not explain why he needed a light duty assignment, nor does he argue that he was unable to perform his regular job and the record does not support such claim. In fact, a "Return to Work" slip prepared on March

21, 1996 by Dr. Charles L. Anderson, the physician who treated Miller's shoulder injury, states that Miller was unable to work between March 19, 1996 to March 24, 1996 because his medication caused drowsiness, but that Miller could do work where he was permitted to rest. Perry Reply Declaration, Ex. B. On another Return to Work slip dated March 26, 1996, Dr. Anderson states that Miller could return to "full duties." *Id.* Miller does not challenge the accuracy of the Return to Work slips. As such, Miller has not met the first prong of the disparate treatment test. Miller has, therefore, failed to demonstrate the existence of any issue of fact which, if determined in his favor, would support his claim that ITT unlawfully discharged him based on his shoulder injury in violation of New York Human Rights Law.

Williams must demonstrate that he was treated less favorably than another ITT employee with a disability similar to whatever disability Williams suffered at the time of his discharge, and who committed an offense of comparable seriousness to failing to call-in within 48 hours of his absence from scheduled work, in accordance with § 6.03(b). *Graham, supra,* at 39–40. However, here, Williams has not even specified the physical disability for which he was taking the medication that caused him to become so drowsy that he was unable to walk several block to a public telephone in order to report that he would not be able to work his scheduled shift at ITT. Williams has thus failed to demonstrate the first prong of the disparate treatment test. Accordingly, no genuine issue of material fact exists on which a jury could find in favor of Williams on his disability claim under New York Human Rights Law.

Defendant ITT's motion for summary judgment as to the disability claims brought by Miller and Williams should be GRANTED.

### B. *Race Discrimination Claims*

All three Plaintiffs assert ITT discriminated against them by terminating their employment on the basis of race in violation of 42 U.S.C. § 1981 and New York Human Rights. (First and Fourth Causes of Action). Plaintiff Williams also asserts the same claim under Title VII. (Second of Action). Defendant Union argues such claims should be dismissed as Plaintiffs are unable to establish a *prima facie* case for racial discrimination under any of those statutes.

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings ...." 42 U.S.C. § 1981 (1996). The Civil Rights Act of 1991 amended § 1981 to protect the terms and conditions of employment including termination. *Butts v. City of New York Dep't. of Housing,* 990 F.2d 1397, 1404 (2d Cir.1993). Title VII makes it unlawful for an employer to refuse to hire or to discharge or to otherwise discriminate against any individual on the basis of, *inter alia,* the individual's race.

As stated, to establish a *prima facie* case of discriminatory discharge in violation of Title VII or § 1981, a plaintiff must demonstrate that (1) he belongs to a protected class, (2) he was performing his duties satisfactorily, (3) he was discharged, and (4) his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. *McLee, supra,* at 134. The same burden-shifting analysis is applied to racial discrimination actions based on N.Y. Exec. Law § 296. *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041,

1045 (2d Cir.1992). A plaintiff's burden to establish a *prima facie* case of employment discrimination to defeat summary judgment is *de minimus,* and the court's determination on summary judgment is limited to "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *McLee, supra,* at 135. The court examines whether any of the three Plaintiffs has met this burden.

With regard to the Plaintiffs racial discrimination claims, it is undisputed that, as African Americans, they were members of a protected class and, as such, have met the first step of the *McDonnell Douglas* burden-shifting test. It is also undisputed that the termination of each Plaintiff's employment at ITT constituted an adverse employment action, thus satisfying the second step of the burden-shifting test. Further, ITT has articulated a non-discriminatory reason for discharging all three Plaintiffs, as required by the third step. However, Lee maintains that the non-discriminatory reason stated for his discharge was not legitimate and all three Plaintiffs assert that such reasons, if legitimate, nevertheless were mere pretexts for racial discrimination.

### 1. *James Lee*

Plaintiff Lee maintains that the proffered reason for his discharge, *i.e.,* his leaving work without permission, neither constituted a legitimate reason for discharging him and also is a mere pretext for what was in actuality a racially motivated decision. Lee also contends that ITT subjected him to disparate treatment when it took disciplinary action against him for having a plate of food at his work station on January 5, 1996. Although ITT denies both these allegations, the record contains genuine issues of material fact as to whether the non-discriminatory reason ITT proffers for discharging Lee is legitimate, thereby precluding summary judgment as to Lee's Title VII, § 1981 and New York Human Rights for employment discrimination based on race.

The record demonstrates that after Shine observed Lee on January 5, 1995, with a plate of food at his workstation in ITT's machine shop, Shine walked through the machine shop, but did not see other employees with food at their workstations as Lee had claimed. When Shine questioned the foreman whether other ITT employees were permitted to have food at their work stations, the foreman replied that other employees occasionally were caught with food at their work stations and were "encouraged to restrict their eating to lunch and break periods." Lee's Incident Report. However, the foreman did not indicate that other employees had been disciplined for having food at their work stations. Lee's Last Chance Agreement pursuant to which he was reinstated at work provides that upon any violation of any ITT Shop Rule or the Work Place Violence Policy within two years of his reinstatement, Lee would be discharged.

When Lee reported to work at 6:45 A.M. on March 19, 1996, he was unable to locate his time card and walked out. According to Lee, he left ITT because he was returning from sick leave and did not know to which department he was to report. Lee maintains that he was advised to speak with Mr. Shine, but that Mr. Shine was not expected until 8:30 A.M. Lee maintains that rather than wait for 1¾ hours, he would run an errand, specifically, he decided to go to a pharmacy and have a prescription filled for his wife. According to Lee, he returned at 9:00 A.M. and was told he had been suspended.

As a threshold matter, ITT argues that Lee's claims must be dismissed as Lee

admitted in his deposition that neither ITT nor Shine has discriminated against Lee on the basis of his race, thereby waiving his claim for racial discrimination. Defendant Union's Reply Memorandum at 7–8; Shine Reply Affidavit, ¶ 10; Lee Deposition Testimony at 102–103, 238–39.[17] As relevant, Lee testified at his deposition as follows:

Q. Mr. Lee, is it your claim that Mr. Shine has discriminated against you in connection in your employment at ITT because of your race?

A. No, sir.

Q. Pardon me?

A. No, sir.

Q. Is it your claim that anybody at ITT discriminated against you in connection with your employment at ITT because of your race?

A. No, sir.

\* \* \* \* \* \*

Q. Okay. I direct your attention to page three of your complaint, paragraph fifteen. If you'd read that to yourself. What information do you have, Mr. Lee, that African Americans have been excluded from certain departments in the plant?

A. I never said something about that. Did you ever hear me say something about that?

Q. Well, it's part of your complaint, part of this complaint which is your complaint.

A. I didn't say that.

Q. That's a fair enough answer. You didn't have any information that—

A. That's right.

Q. Okay. What information do you have that African Americans have

been discriminated against with respect to hiring at the plant?

A. I don't know.

Q. You don't have any information about that?

A. No.

Q. That's not a claim you're making?

A. No.

Q. And what information do you have that African Americans have been discriminated against with respect to pay?

A. I didn't say anything about that either.

Q. Again, that's not a claim you're making?

A. No.

Lee Deposition Testimony at 102–103; 238–39.

In opposition to summary judgment, Lee submits an affidavit in which he explains the apparent inconsistency between his deposition testimony and the claims he asserts against ITT and the Union in this action as based on his misinterpretation of such questions as relating only to whether he experienced discrimination in connection with becoming hired by ITT. Lee Affidavit, ¶ 2. Lee maintains that although he did not experience any discrimination when he was hired, he believes he was discriminated against in connection with his exclusion from jobs in certain departments, discipline and the termination of his employment. Lee Affidavit, ¶ 2.

In opposing summary judgment, a party may not create an issue of fact by submitting an affidavit that, by omission or addition, contradicts the party's previous deposition testimony. *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 619 (2d Cir.1996) (citing *Perma Research*

---

17. The relevant portions of Lee's Deposition Testimony are attached as Exhibit D to Defen-

dant ITT's Notice of Motion (Docket Item No. 16).

& *Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). " 'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' " *Mack v. United States*, 814 F.2d 120, 124–25 (2d Cir.1987) (quoting *Perma Research, supra,* at 578). Nevertheless, an affidavit which only "arguably" contradicts prior deposition testimony does not merit rejection by the court. *Hayes, supra,* at 620.

In *Hayes,* a prison inmate commenced a civil rights action against prison officials whom the inmate alleged failed to provide adequate protection and, as a result, the inmate was attacked by other inmates on three separate occasions. *Hayes, supra,* at 617–18. During two separate depositions taken before trial, the plaintiff made statements that were not entirely consistent. Specifically, the plaintiff testified in his first deposition that he was not able to identify the inmates who had threatened him to the defendant prison officials as he did not know their names. *Id.* at 618. In a subsequent deposition, the plaintiff stated that he provided the prison officials with the name of one of the inmates who had threatened him. *Id.* The district court interpreted the plaintiff's second deposition as contradicting his first deposition as an attempt to create a material issue of fact and avoid summary judgment, disregarded the second deposition to the extent it was inconsistent with the first, and granted summary judgment in favor of defendants. *Id.* at 619. The Second Circuit reversed finding, *inter alia,* that the testimony given at the second deposition was only "arguable contradictory" with the testimony given at the first, explaining that the only discrepancy between the two sets of testimony was whether the plaintiff provided the defendant prison officials with the name of his attacker. *Id.* at 619–20.

Similarly, in the instant case, Lee's affidavit only arguably contradicts his deposition testimony. Lee's affidavit is more properly construed as explaining his confusion over the questions posed to him at his deposition. Lee's explanation is plausible given that Lee was asked questions pertaining only to his "employment" with ITT, rather than specifically directed to his discharge or termination from ITT, disciplinary actions against him, and applications for jobs in other departments. Accordingly, Lee's affidavit in itself does not create any issue of fact. Rather, it merely aids the court in understanding Lee's claims against ITT. As such, Lee's affidavit will not be disregarded, nor will Lee's claims be deemed waived based on any inconsistency between his deposition testimony and his affidavit.

In this case, a genuine issue of material fact exists as to whether ITT's stated reason for discharging Lee, *i.e.,* violating the Last Chance Agreement, was a legitimate, non-discriminatory reason. As discussed in connection with the Union's motion for summary judgment, Discussion, *supra,* at 339, although Lee's Last Chance Agreement may remove from consideration such issues as the justification for Lee's removal upon determining that Lee violated a Shop Rule or the Work Place Violence Policy, as discussed, *supra,* in connection with Lee's claims against the Union, it does not preclude consideration of the essential issue, that is, whether Lee's conduct in leaving work on March 19, 1996, constituted a violation of either ITT's Shop Rules or Work Place Violence Policy. Further, ITT has not specified what Shop Rule or Work Place Violence Policy provision Lee violated by leaving work on March 19, 1996. As Lee points out, as he

never finished signing in on March 19, 1996, it is not clear that his conduct could be considered as "walking out." Lee Deposition Testimony at 35–37.[18] Lee has also provided evidence that at least one other, non-minority employee who walked off the job at ITT was terminated, but later reinstated. Specifically, Shine testified that Paul Smith, Jr., who is white, was terminated for walking off the job, but was later reinstated.[19] Shine Deposition Testimony at 40. As stated, Shine testified that Lee's Last Chance Agreement does not mandate the discharge of any employee found to have violated such agreement, Shine Deposition Testimony at 44, and Lee's prior disciplinary record is irrelevant to that issue. Nor has ITT submitted anything establishing that the ITT security guard who allegedly suggested that Lee sign in anyway and wait for Shine had any authority to direct Lee to do so, or that the Union official with whom Lee allegedly spoke upon returning home, was authorized to order Lee to report to work. That Lee did report to work at 9:00 A.M., a fact which ITT does not dispute, lends credibility to Lee's assertion that he intended to return when he knew Shine would be there. Further, although an isolated incident may be insufficient to demonstrate racial disparity, *Graham, supra,* at 41, until ITT has demonstrated a legitimate non-discriminatory reason for terminating Lee, the burden does not shift to Lee to demonstrate that such reason is merely pretextual by a showing of racial disparity. *Id.* at 42.

ITT also argues that Lee, by signing the Last Chance Agreement, has waived any claim stemming from his Last Chance Agreement. Defendant ITT's Memorandum at 7 & n 19. Lee's Last Chance Agreement provides that if Lee is later discharged pursuant to the agreement, "Mr. Lee agrees not to file a claim or commence any lawsuit contesting the discharge under the New York State Human Rights Law, the Federal Civil Rights Act of 1974 (Title 7), or any other law." Lee's Last Chance Agreement, ¶ 6. However, a plain reading of Lee's Last Chance Agreement shows that the "discharge" referenced therein is not the instant discharge but, rather, Lee's discharge which led to the execution of his Last Chance Agreement, *i.e.,* for refusing Shine's directives and threatening Shine. Accordingly, there is no merit to ITT's argument that Lee, by signing the Last Chance Agreement, has waived his right to contest in this action his most recent discharge.

Moreover, as a genuine issue of material fact exists regarding whether the non-discriminatory reason given by ITT for Lee's discharge, the burden does not shift from ITT back to Lee to provide evidence that such reason was merely pretextual. Defendant ITT's motion for summary judgment should be DENIED as to Lee.

---

18. ˙Portions of the relevant pages of Lee's Deposition Testimony are attached as Exhibit K to Plaintiffs' Rule 56 Fact Statement (Docket Item No. 25).

19. Although Plaintiffs also maintain that other ITT employees, including Joe Pappagallo˙ and James Mahaney, both of whom are white and who had extensive disciplinary records, were not terminated for walking off the job, Plaintiffs' Memorandum at 4, much of the evidence Plaintiffs submit in support of their argument, *i.e.,* Deposition Testimony of Lee and Williams, qualify only as self-serving and conclusory allegations. Although evidence submitted under seal pertaining to Mahaney demonstrates that Mahaney had an extensive disciplinary record, additional evidence submitted by ITT establishes that on November 25, 1998, Mahaney was terminated for violating ITT's Work Place Violence Policy when he threatened a supervisor. *See* Exhibit E to Shine Reply Affidavit. Accordingly, the evidence show Mahaney was treated similarly to Plaintiffs.

352

## 2. Anthony Miller

■ Miller alleges that ITT discriminated against him on the basis of his race when he was discharged for falsifying a workers' compensation claim. According to Miller, although falsification of a workers' compensation claim may be a valid reason to discharge an employee, with regard to Miller, such reason was merely pretextual. However, Miller has failed to submit sufficient evidence establishing the requisite disparate treatment to make a *prima facie* case, and avoid summary judgment.

At the third step of the *McDonnell Douglas* burden-shifting test, the defendant is required to articulate a legitimate non-discriminatory reason for terminating the employee. *McDonnell Douglas, supra,* at 892, 93 S.Ct. 1817. In this case, ITT asserts that Miller was terminated on April 18, 1996 for filing a false workers' compensation report and the record demonstrates that such reason was legitimate. Miller, however, claims that ITT's articulated reason is merely pretextual to cover their real reason for discharging him, *i.e.,* Miller's race, as he did not apply for workers' compensation with regard to his shoulder injury until July 1996. Miller's Affidavit, ¶¶ 9–11. The facts, however, demonstrate otherwise.

Significantly, attached as Exhibit B to the Perry Reply Affidavit are copies of documents showing that as early as March 20, 1996, Miller had advised ITT that he hurt his shoulder at work on March 18, 2000. *See* copy of "call in slips" dated March 20, 1996 in which Miller advised ITT that he would not be reporting to work that day because of his shoulder injury sustained at work two days earlier; Workers' Compensation Board form filed by ITT in connection with Miller's claim, dated March 25, 1996; detailed accident report dated March 28, 1996 indicating

that on March 20, 1996, Miller reported his accident to his supervisor, Doreen Nawojski; and Decision of Workers' Compensation Board which states that Miller filled out an accident report pertaining to his shoulder injury on March 22, 1996. Miller does not dispute the accuracy of these exhibits.

Nor has Miller demonstrated that other non-minority employees who committed similar offenses were treated more favorably than African American, and therefore has failed to show racially disparate treatment evidencing that the legitimate reason proffered for his discharge was merely pretextual. As discussed, at the fourth step of the *McDonnell Douglas* burden-shifting test, the plaintiff is required to demonstrate that the employer subjected him to disparate treatment, that is, "treated him less favorably than a similarly situated employee outside his protected group." *Graham, supra,* at 39.

The only evidence Miller submits on this point is that Shine testified regarding two white female ITT employees who were also accused by ITT of falsifying workers' compensation claims. Plaintiffs' Memorandum at 7 (citing Shine Deposition Testimony at 67–68). One of those employees was Irissia Robinson whom Miller admits was also terminated for the offense. Plaintiffs' Memorandum at 7. However, a plain reading of Shine's testimony reveals that Shine recalled that Robinson was the only other ITT employee who had been terminated for falsifying a workers' compensation claim. Shine Deposition Testimony at 67–68. Shine later clarified that in addition to Robinson, Linda Shaw Smith, an African American female employee was terminated, not for filing a false workers' compensation claim, but for altering a medical note from her physician. Shine Reply Affidavit, ¶ 11. The record thus does not contain, as required, sufficient evidence of

racially disparate treatment evidencing that non-minority employees who falsified workers' compensation claims or committed similar offenses were treated more favorably that African Americans. *Graham, supra,* at 39–40.

As to Miller's assertion that ITT undertook an extensive investigation of a white female employee who was suspected of falsifying a workers' compensation claim before terminating her, such fact does not support a finding of an issue of fact pertaining to racial disparity. The female employee to whom Miller refers is Irissia Robinson. The record demonstrates that ITT hired a private investigator to conduct surveillance of Robinson to determine if she truly were disabled as alleged in her workers' compensation claim. Confidential Investigative Report of Irissia Robinson, attached as Exhibit A to Plaintiffs' Rule 56 Statement (Docket Item No. 25). Although an extensive investigation was carried out, Robinson's situation occurred over several months, compared to Miller's shoulder injury which lasted only a few days. Shine Reply Affidavit, ¶ 11.

Further, the Confidential Investigative Report indicates that what was at issue with regard to Robinson was not whether she had injured herself at work, but, rather, whether Robinson remained unable to work following an established work-related injury. *Id.* In this case, ITT does not challenge Miller's claim that he was temporarily rendered unable to work based on his strained shoulder; rather, the ITT challenged whether Miller sustained his shoulder injury at work. Accordingly, that ITT arranged for an extensive investigation of Robinson's claims that she was unable to work is irrelevant to the fact that no similar investigation was undertaken with regard to Miller's claim that he was unable to work. Moreover, the record demonstrates that as the confidential in-

vestigation showed that Robinson was not injured as she claimed, she was terminated for filing a false workers' compensation report. Shine Reply Affidavit, ¶ 11. Thus, Miller fails to establish a material issue of fact, based on disparate treatment, that his termination was racially motivated.

On this record, ITT's motion for summary judgment as to Miller should be GRANTED.

### 3. *Terry Williams*

██ Williams challenges that ITT's asserted nondiscriminatory reason for discharging him, that he violated the 48–hour call in rule set forth in § 6.03(b) of the CBA when he failed to call in and report that he was unable to work as scheduled on September 14, 16 and 17, was merely pretextual for the fact that he was discharged based on his race. The record, however, demonstrates otherwise.

Williams has failed to demonstrate that ITT gave preferential treatment to nonminority employees in applying § 6.03(b). *See Graham, supra,* at 41–42. Although Williams asserts that other ITT employees, including James Astyk, David Nuccio, Winters Miles and Betty Miller also violated § 6.03(b), yet were not discharged, Plaintiffs' Memorandum at 8, Williams submits no admissible evidence that such employees, who it is undisputed were white, were otherwise "similarly situated" to Williams, *i.e.,* had similarly abysmal attendance rates over a number of years, such that the fact that those employees were not terminated demonstrates racially disparate treatment.

As to the fact that one Mike Kubala had a worse attendance record in 1986 than did Williams, yet was not terminated, Plaintiffs' Memorandum at 9, Shine explained that Kubala's situation in 1986 cannot be fairly compared with Williams's situation

354

in 1996 as a different attendance policy was in use in 1986 than in 1996. Shine Reply Affidavit, ¶ 14. Shine also testified that Kubala was disciplined for his poor attendance. *See* Exhibit F to Shine Reply Affidavit. Williams does not dispute this information.

In particular, Williams does not provide anything evidencing that a non-minority ITT employee with a similar disciplinary and attendance record, was not terminated for violating the 48–hour call-in rule. Nor does Williams argue that the Union has pursued arbitration of a non-minority employee's grievance arising from an employee's discharge for violating the 48–hour no-call rule on the basis that the same explanation for failing to call in proffered by Williams—that the medication he took for his unspecified medical condition rendered him unable to walk several blocks to the nearest public telephone—constituted good cause.

Moreover, Williams's claim that despite his high absentee rate between 1984 and 1994, he was absent from work without excuse only 2.7% of his scheduled work days, and that the bulk of his absences during that period were for legitimate workers' compensation or disability leaves, Williams's Affidavit, ¶ 4, is no indication that ITT's stated reason for discharging him was merely pretextual. Rather, such fact indicates that ITT permitted Williams to continue to work despite irregular attendance, and only took disciplinary action against Williams when he failed to call in as required under § 6.03(b).

Nor has Williams demonstrated the existence of any genuine issue of material fact that he was paid less than non-minority ITT employees with less seniority, or that any application he filed for another position was denied, as he claims. Plaintiffs' Memorandum at 10–11. Again, in support of this assertion, Williams relies

only on self-serving and conclusory statements made at his deposition which, as discussed, are insufficient to avoid summary judgment on an issue as to which the nonmovant bears the ultimate burden of proof. *Goenaga, supra,* at 18.

Accordingly, ITT's motion for summary judgment as against Williams should be GRANTED.

### 4. *Scurrilous Remark*

Plaintiffs' Memorandum of Law refers to Will Shine as ITT's "*token* African-American human resources manager." Plaintiffs' Memorandum at 1 (emphasis added). Both ITT's attorney, Adam W. Perry, and Mr. Shine complain that such remark is personally offensive and a racially motivated scurrilous remark, and seek a court order that Sanders immediately apologize in writing to Shine for the assertion. Perry Reply Affidavit, ¶ 2; Shine Reply Affidavit, ¶¶ 2–3. Sanders has not responded to this issue.

"The Code of Professional Responsibility of the American Bar Association as adopted by the New York State Bar Association shall be enforced in this Court." Rule 83.3, Local Rules of Civil Procedure for the Western District of New York. The Code of Professional Responsibility, as adopted in this state, provides, in relevant part, that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice." Code of Professional Responsibility, Disciplinary Rule ("DR") 1–102.A.5., N.Y. Judiciary Law (McKinney 1992) (Appendix). Lawyers who practice before this court are therefore obliged to "maintain high standards of professional conduct." Ethical Consideration ("EC") 1–5. *Id.* Further, lawyers are forbidden from "[e]ngag[ing] in undignified or discourteous conduct... degrading to a tribunal." DR 7–106.C.6. *See also* Civility Principles, United States District Court for the

Western District of New York, Lawyers Duties to Other Counsel, Principle No. 1 (obligates counsel to "treat all... parties, and witnesses in a civil and courteous manner... in *all* ... written communications," and to "refrain from ... manifesting bias or prejudice based upon race") (emphasis added), and Principle No. 2 (obligating counsel to "abstain from disparaging personal remarks"). Adopted September 28, 1998.

The court finds Plaintiffs' assertion, published in a court document filed and signed by counsel, to be a gratuitous slur of a racial character upon Mr. Shine's qualifications and reputation. Such comment does not appear to be warranted by anything in the record, nor does it appear to be within the bounds of counsel's obligation to represent his clients' interests with an expected degree of warm zeal. *United States v. Gotti,* 771 F.Supp. 535, 544 (E.D.N.Y.1991) ("let [counsel's] zeal be as warm as [counsel's] heart's blood, but let it be tempered with discretion and with self-respect"). Accordingly, the statement, unretracted by Plaintiffs or Mr. Sanders, constitutes a probable violation of DR 1–102.A.5, which prohibits conduct by attorneys that impugns the standing of the profession and the integrity of the courts in the eyes of the public, and a probable violation of DR 7–106.C.6, prohibiting discourteous and degrading statements in the course of litigation before a court, as to do so would undermine public respect for the court and the administration of justice in this district. As such, the statement cannot be overlooked or countenanced by this court. The District Judge should, therefore, issue an order directing Mr. Sanders to show cause, either before the District Judge or a Magistrate Judge of this court, why he should not be disciplined and sanctioned pursuant to Local Rule of Civil Procedure 83.3(a) based on the statement at issue.

*CONCLUSION*

Based on the following, Defendant ITT's motion for summary judgment (Docket Item No. 16) is GRANTED in part and DENIED in part; Defendant Union's motion for summary judgment (Docket Item No. 18) is GRANTED in part and DENIED in part. Defendant ITT's motion to strike (Docket Item No. 32) is GRANTED in part and DENIED in part. Mr. Sanders should be ORDERED to SHOW CAUSE why he should not be sanctioned and disciplined with regard to the unretracted and scurrilous racial remark.

SO ORDERED as to Defendant ITT's motion to strike.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

SO ORDERED.